# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

| | | |
|---|---|---|
| BETTY HATMAKER and CHARLENE EDWARDS, on behalf of themselves and others similarly situated, | ) ) ) | **COMPLAINT FOR BREACH OF FIDUCIARY DUTY REGARDING ERISA WELFARE** |
| Plaintiffs, | ) ) | **PLAN** |
| | ) | |
| v. | ) | CASE NO. _____ |
| | ) | |
| CONSOLIDATED NUCLEAR SECURITY, LLC | ) ) | CLASS ACTION JURY TRIAL REQUESTED |
| | ) | |
| Defendant. | ) | |

Plaintiffs, Betty Hatmaker and Charlene Edwards ("Plaintiffs"), on behalf of themselves and others similarly situated ("the Classes"), allege as follows:

## <u>INTRODUCTION</u>

1.        Plaintiffs are salaried and hourly individuals who were employed at various dates as more specifically discussed herein by contractors for the Y-12 National Security Complex in Oak Ridge, Tennessee ("Y-12"). These contractors include, *inter alia*, Union Carbide, Martin Marietta, Lockheed Martin, BWXT, Babcock & Wilcox, LLC, and Consolidated Nuclear Security, LLC (collectively "Contractors"). As of the filing of this Complaint, Consolidated Nuclear Security, LLC ("CNS") is the current Contractor operating and administering the healthcare plan for retirees of the various predecessor Contractors (the "Plan"). Plaintiffs were and are eligible for healthcare and other welfare benefits upon their retirement pursuant to written agreements as well as written and verbal representations made to them by employees and agents of the Contractors.

2. The Classes consist of individuals who worked as salaried or hourly employees, who retired from employment at Y-12 during the relevant time period, and whose retiree healthcare benefits have been or may be modified, amended or terminated by CNS. The Classes consist of persons who retired from the Y-12 National Security Complex, but may also include those have worked or retired from the K-25 Gaseous Diffusion Plant.

3. The retiree healthcare benefits and the requirements for receiving these benefits were explained to the Plaintiffs and the members of the Classes in written and verbal communications made during their tenure as employees at Y-12, including at or near the time of their retirement.

4. The retiree healthcare benefits are currently provided and/or administered by CNS in its capacity as the current Contractor for Y-12.

5. The members of the Classes include retirees, and their covered spouses, surviving spouses, and/or dependents of retirees who retired from Y-12 and were provided healthcare coverage under agreements negotiated by the Contractors.

6. On January 1, 2015, CNS made several changes to the healthcare and welfare benefits of the Plaintiffs and the Classes which significantly altered the cost, coverage and value of their healthcare benefits.

7. This action is brought on behalf of Y-12 retirees in the United States seeking to either restore their healthcare benefits to the levels that existed prior to January 1, 2015, or to be reimbursed for the value of the increased out-of-pocket costs and the reduction in the level of benefits suffered by the Plaintiffs and the members of the Classes as a result of changes made to their retiree healthcare benefits by CNS.

8.     The Plaintiffs and the members of the Classes herein object to all changes to their healthcare benefits that were implemented on January 1, 2015 and any that followed thereafter.

## PARTIES

9.     Plaintiff and class representative Betty Lou Hatmaker is a resident of Knoxville, Tennessee.  She is a participant in the Plan provided and/or administered by CNS pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA") and the agreement under which Ms. Hatmaker worked and retired.  Ms. Hatmaker began working at Y-12 on or about August 2, 1976 and retired on January 1, 2010 at the age of 53.  Ms. Hatmaker had thirty-three years and five months of active service at Y-12.

10.     Plaintiff and class representative Charlene Cromer Edwards is a resident of Knoxville, Tennessee.  She is a participant in the Plan provided and/or administered by CNS pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA") and the agreement under which Ms. Edwards worked and retired.  Ms. Edwards began working at Y-12 on or about March 1, 1975 and retired on August 1, 2006, at the age of 54.  Ms. Edwards had thirty-one years and five months of active service at Y-12.

11.     The Classes consists of several thousand individuals including retirees (and surviving spouses and dependents of retirees) who worked under agreements entered into with CNS and/or its predecessor Contractors, and who retired from their employment at Y-12 between January 1, 1975 and December 31, 2014, and whose negotiated healthcare and related benefits have been or may be improperly modified, altered or terminated by CNS.  The members of the Classes include retirees, spouses, surviving spouses and/or dependents of retirees who retired from employment with the Contractors and were covered by agreements entered into with the

Contractors covering hourly and/or salaried employees. The Classes are separated into two subclasses as follows:

a. *Medicare-eligible former employees of the Contractors who are now retired (as well as their eligible surviving spouses and dependents) who had worked under agreements entered into with the Contractors and who retired from such employment between January 1, 1975 and December 31, 2014*;

b. *Pre-Medicare former employees of the Contractors who are now retired (as well as their eligible surviving spouses and dependents) who had worked under agreements entered into with the Contractors and who retired from such employment between January 1, 1975 and December 31, 2014*;

12.     All members of the Classes retired with healthcare benefits provided under various employment agreements with CNS and/or its predecessor contractors, and provided under its sponsored retiree healthcare benefit plan governed by ERISA which comprises a part of the retiree welfare benefits plan.

13.     CNS is a corporation with its principal place of business in Oak Ridge, Tennessee. CNS operates the Pantex Plant near Amarillo, Texas and the Y-12 National Security Complex at Oak Ridge, Tennessee. CNS combines the resources of Bechtel National, Inc., Lockheed Martin Services, Inc., ATK Launch Systems, Inc., SOC LLC, with Booz Allen Hamilton, Inc. as a teaming subcontractor. The chief executive officer and chief operating officer are based in Oak Ridge, Tennessee. CNS has a significant management presence located at both the Pantex and Y-12 sites.

14.     Upon information and belief, at all times pertinent to this lawsuit, CNS and the Contractors were the Plan administrators and Plan sponsors of the retiree healthcare Plan at issue in this lawsuit within the meaning of 29 U.S.C. § 1002(16)(a) & (b), and were fiduciaries of those Plan within the meaning of 29 U.S.C. § 1002(21), due to the fact that they exercised

discretionary authority or control respecting the management of the Plan, exercised authority and control respecting management or disposition of the Plan's assets, and/or had discretionary authority or responsibility in the administration of the Plan.

15.     Employees and agents of CNS and the Contractors, acting in a fiduciary capacity, explained the retiree healthcare benefits to the Plaintiffs and the members of the Classes, making numerous misrepresentations regarding lifetime rights to post-retirement healthcare benefits that would remain unchanged from the levels they had as active employees.   Both positive misrepresentations and omissions of material fact occurred within the course and scope of the employment and fiduciary agency of these employees and agents of CNS and the Contractors. Because the retiree healthcare benefits were not in fact secure from reduction or termination throughout retirement, the Contractors systematically misrepresented the nature, terms content and duration of these benefits to the Plaintiffs and the members of the Classes, through their failure to clearly and conspicuously disclose material information about the retiree healthcare benefits and/or by affirmative fraudulent misrepresentations and/or omissions of material information about the retiree healthcare benefits.

16.     The CNS Retire Healthcare Plan is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1), and is established and maintained by CNS for the purpose of providing subsidized retiree medical and prescription drug benefits to former employees of the Contractors who met certain age and service requirements, and of providing similar benefits to the eligible spouses and dependents of retirees from the Contractors.   Upon information and belief, CNS is an entity which may be sued pursuant to 29 U.S.C. § 1132(d).

## JURISDICTION AND VENUE

17. This Court has jurisdiction over these claims by virtue of: 29 U.S.C. § 1104(a) due to CNS's and the Contractor's breach of fiduciary duty to the Plaintiffs and the members of the Classes not to mislead them about the terms of their retiree healthcare plans; 29 U.S.C. § 1132 (a)(1)(B) to clarify their rights to future benefits under the terms of their healthcare plans; 29 U.S.C.§ 1132(a)(2) to remedy the breach of fiduciary duties relating to misrepresentation about the nature and extent of the Plan; and 29 U.S.C. § 1132(a)(3) to enforce the provisions of ERISA and the terms of the Plan by seeking relief under the statute to redress violations of the terms of their agreements that are based on the breach of fiduciary duties.

18. The Court also has jurisdiction under 28 U.S.C. § 1331 as the claims arise under the laws of the United States. In addition, these claims are brought within any applicable statute of limitations or repose.

19. Venue exists in this Court because the employment agreements in this case were entered into in this District and Division, a breach took place in this District and Division, and CNS may be found in this District and Division. A substantial part of the events and omissions given rise to the Plaintiffs' claims occurred in the County of Anderson where CNS may be found and which is served by the Northeastern Division. Venue is proper in this District under the provisions of 29 U.S.C. § 1132(e) and 29 U.S.C. § 185(a).

20. All of the Plaintiffs and the members of the Classes retired from employment in Oak Ridge, Tennessee.

21. The retirees who are members of the Classes are former long-term hourly and salaried employees of CNS and the Contractors or the covered spouses and/or dependents of former long-term hourly and salaried employees of CNS and the Contractors. As was true

throughout many industries during the decades of their dedicated service, the Plaintiffs and the members of the Classes and other employees were attracted to employment with and were retained by the Contractors, through their program of retiree benefits. Throughout their active careers, the Plaintiffs and the members of the Classes accepted lower levels of compensation based on an understanding derived from representations made by the Contractors that their work was earning them a valuable package of retiree benefits, including healthcare benefits, which would make their retirement years financially secure.

22. The Contractors entered into a series of agreements with the Plaintiffs and the members of the Classes providing for terms and conditions of employment for its salaried and hourly employees. These agreements provide healthcare benefits which include medical, prescription, dental, vision, Medicare subsidy, life insurance and related benefits to the Plaintiffs and members of the Classes. The agreements also covered spouses and surviving spouses of retired employees, as well as certain defined dependents. The agreements provided substantial benefits to several thousand retirees.

23. The agreements provide for healthcare insurance benefits for active and retired employees, and incorporated by reference a healthcare benefit Plan. Generally, retirees (and others such as spouses and defined dependents) who are entitled to a pension under the pension plan are eligible for healthcare benefits upon retirement.

24. Over the years the Plaintiffs and the Members of the Classes were employed by the Contractors and several different individual contracts were executed that defined the healthcare benefits the Plaintiffs and the members of the Classes would receive in retirement. All of these contracts provided for retiree healthcare plan with specific benefits levels and cost limitations. As each new Contractor took over from the previous one, it adopted the provisions

of these agreements. At no time prior to January 1, 2015 were any of the terms of the previous employment agreements, and specifically their provision of retiree healthcare benefits, ever rejected by an incoming Contractor. As a result, Plaintiffs and members of the Classes were induced to understand that they would continue after and throughout retirement to receive the previously defined and promised levels of medical and prescription drug benefits for their lifetimes.

25. In addition, some of the Contractors adopted an "early retirement" program for retirees to encourage more senior, and in general more highly paid, employees to retire earlier than they otherwise would have. Such early retirement programs were repeatedly utilized by the Contractors to induce senior employees to retire early and thereby create significant savings for the Contractors by avoiding payroll, fringe benefit and additional pension accruals and costs for the employees who were induced to retire early. The Contractors represented to the Plaintiffs and members of the Classes that accepting early retirement would enable them to retain their healthcare benefits and avoid application of any future changes in these benefits. Due to the financial importance of these benefits to retirees and their spouses over their anticipated years of retirement, the opportunity to secure these benefits was a powerful motivator for those eligible employees to accept early retirement.

26. The retirees were repeatedly told by representatives of the Contractors that they would receive their healthcare benefits for the entire duration of their retirement.

27. CNS administers and funds these benefits primarily through the CNS Benefits Plans Administrative Committee ("BPAC"), and, on information and belief is a fiduciary of the healthcare plan.

28.     Upon information and belief during some or all of the pertinent times, CNS and/or BPAC were plan administrators, plan sponsors and plan fiduciaries within the meaning of ERISA.

29.     At or near the time when the Plaintiffs and the members of the Classes retired, the Contractors generally held retirement benefit seminars and/or interviews for retiring employees. During these seminars and/or interviews employees contemplating retirement were given misinformation upon which they relied relating to the content of their retirement benefits. For example, in a PowerPoint presentation entitled "Retirement Benefits Seminar For Individuals Who Are Eligible For Pension Benefits" dated "June 2012" the Plaintiffs and Members of the Classes were shown a slide that stated:

30.     A virtually identical slide was included in an earlier 2010 presentation:



**Medical and Dental Plans – General Information (All Retirees Regardless of Age) (cont.)**

- If your spouse is retired from ORNL and you provide his/her medical and/or dental coverage through Y-12, at the time of your retirement there is an important decision to make. He/she can continue in Y-12's medical plan (CIGNA or Medicare Supplement Plan) and/or dental plan based on dependency rules. However, it is essential to note two very important situations.

- In the event of your death, your spouse will be allowed to continue coverage in the Y-12 plan (providing coverage was in effect at the time of your death). Should your spouse want to return to the ORNL plan after your death, current guidelines do not allow re-enrollment. Therefore, Y-12's plan should be considered as a lifetime plan, unless cancelled.

31.     The last sentence on both slides expressly and unequivocally states "Y-12's plan *should be considered as a lifetime plan*, unless cancelled."

32.     In addition, during these retirement seminars and/or interviews, Plaintiffs and the members of the Classes were misinformed about the level of healthcare benefits and out-of-pocket costs they would be subject to at the time they ended their employment. The following examples are only illustrations of the types of misstatements and misrepresentations made to the Plaintiffs and the members of the Classes by the Contractors, their agents and representatives:

> a.    **Plaintiff Betty Lou Hatmaker** retired January 1, 2010 at age 53 after slightly under thirty-three and a half years at Y-12. "My whole time at Y-12 I was told that my retirement package was 30-40% of my entire compensation package. Several supervisors including Leon Brasel, A.R. Brown, Bill Butterini, and Ron Cox told me this during yearly performance reviews. Because raises were small and I always felt I worked harder than anyone else and deserved more, so they reminded me

10

that when I retire, 'you get this wonderful pension and insurance package.'"

Ms. Hatmaker attended either one or two retirement seminars. "[N]either time was it mentioned that there was a chance our insurance would change or could be taken away completely. It was not until January 1, 2010 on the last piece of paper I signed that I saw a statement about the insurance was not guaranteed. If you didn't sign the paper you did not get your pension check."

"In the retirement seminars it was explained that we would keep our insurance, but would pay 25% of the premium instead of 20% that employees paid. We would be able to keep the exact policy that we had as an employee and since I was the younger one, my spouse would be able to stay on my plan until I turned 65."

"Nothing was explained about [changes or termination], even during my exit on January 1, 2010. I was just asked to sign the paper and Connie Polson asked that I read it before signing it."

Had Ms. Hatmaker been told accurate information she would not have retired when she did and/or would have made other arrangements for additional insurance coverage.

b.    **Plaintiff Charlene Cromer Edwards** retired on August 1, 2006 at age 54 after slightly under thirty-one and a half years at Y-12. At the time she retired she was a Program Manager within the Contracts and Special Initiatives Department. Ms. Edwards was told during a retirement meeting in 2006 with Lora Lee Wilcher that her healthcare benefits would continue at the levels they had been while she was actively employed until she turned 65. She was further told there was no reason to expect any change in healthcare benefits. After she turned 65 she would be able to enroll in a Medicare Supplement Plan that included a prescription drug benefit. Had Ms. Edwards not been told this information she would not have elected to retire early.

c.    **Teresa L. Toole** retired on May 1, 2010 at age 50 after more than eighteen years at Y-12. Ms. Toole and her husband met with Laura Lyles around June 9, 2010 (after signing retirement paperwork) and were told that the healthcare benefits would remain the same as she had while actively employed. There was nothing whatsoever mentioned about any potential change to or termination of the healthcare benefits. All that was mentioned was that premium amount might increase slightly.

d.    **Virginia Gail Shepperd** retired February 28, 2013 at age 62 after twenty-three and a half years with Y-12. At a retirement seminar she attended in

November 2012 Ms. Shepperd was told she could retain her company healthcare benefits until she reached Medicare age, at which time she would be provided Medicare Supplement insurance. No one ever mentioned that her benefit levels could be changed or eliminated.

e.    **Charlotte Garrison England** retired in 2011 at age 65 after twenty-two years at Y-12. Being Medicare-eligible at the time she retired, Ms. England was told her healthcare benefits would remain the same as she had while employed but that Medicare would be primary by Laura Lyles in a 2011 meeting. Nothing was even mentioned about the coverage being subject to change or termination.

f.    **Randell B. Harris** retired June 30, 2014 at age 58 after working twenty-eight years at Y-12. "Throughout the years, I was told by various personnel that we would have comparable health benefits through retirement. That was an attractive benefit to remain with the company and not go to work as a subcontractor at the plant earning more money. During the retirement process toward the end the Benefits person said they were unsure what the new company that was about to start (CNS) would do. At that time we were still B&W. In fact, that is one reason I wanted to go ahead and retire before CNS because I was concerned how they may treat future retirees under cost-cutting efforts. I assume that retirees prior to CNS were secured in their benefits."

g.    **Rhonda Bogard** retired on February 1, 2013 at age 58 after thirty-three years at Y-12. She met with a Benefit Plans representative on approximately December 11, 2012 and was told that those under age 65 could continue in their regular plan after retirement. "We were provided with specific information on our health benefits. It was in place for a very long time and was well understood. No changes were expected. I made my decisions based on the benefits package. I had no reason to believe it would change significantly or at all. I was a second generation employee and never saw any reduction in my Dad's retirement benefits. I never expected a change. No discussion of changes was made at any time."

h.    **Glenn R. Bridges** retired on July 31, 2014 at age 67 after more than forty-seven years at Y-12. Mr. Bridges attended several retirement planning meetings including those by Lockheed-Martin's Benefit Plans manager in 1985 and 1995, by B&W's Benefit Plans manager in 2011, and retirement meetings with Pamela R. Skinner on May 28 2014 and Retirement Processing Associate Shirley Cox on July 31, 2014. He was told that the company would supply healthcare coverage during retirement with a supplement to Medicare and drug coverage. Mr. Bridges was told his group coverage managed by the company would continue until his death and that his surviving spouse would receive continued coverage until her

12

death.  Nothing about any changes to or termination of the coverage was ever explained to him.

i.    **William E. Hodge, Jr.** retired on April 30, 2012 at age 53 after thirty-three years at Y-12.  He attended retirement group seminars on May 5, 2010 and October 5, 2011 and had a personal retirement counseling session on January 24, 2012, and recalled that Jean Williams spoke at one of these sessions.  He was told his healthcare coverage would stay the same after he retired, with one speaker even saying "Don't sign up for Medicare D 'because ours is better.'"  He was told his healthcare benefits could not be terminated it was part of his employment/retirement package.  "No guarantee that Social Security will be there, but this will."

j.    **Mary Vance Jimmerson** retired on August 31, 2005 at age 54 after thirty years of employment (with three years off when her eldest child was born) at Y-12.  "We were told often and regularly that we would continue to receive the same benefits for life, due to the dangerous materials with which we worked and due to the fact that we were Cold War workers, susceptible to receiving higher exposures than average employees."

As Ms. Jimmerson was approaching retirement: "It was explained to me (and to my husband when he retired) that our benefits would continue until we reached 65 when Medicare would kick in, but that Y-12 would provide supplemental, affordable insurance to make sure we were still fully covered.  This is the reason many of us remained at the plants instead of seeking jobs in private industry, because we were assured of the benefits that would never be taken away.  It was explained many times by supervisors (especially at performance review time) that, while we could command higher salaries in private industry, our benefits (including retirement and medical benefits) added another one-third to our overall compensation package.  Unfortunately we were gullible enough to believe this."

33.    For at least forty years, starting in 1975, if not earlier, and continuing until January 1, 2015 (when the benefit changes at issue in this lawsuit took effect), the Contractors consistently, negligently and/or fraudulently misrepresented the nature, scope, duration and immutability of the retiree healthcare benefits to the Plaintiffs and members of the Classes.  As a result, the Plaintiffs and the members of the Classes were induced to believe that they would continue to receive company-subsidized medical and prescription drug benefits for their lifetimes at the levels that were in place at the time they retired.

13

34.     The retiree healthcare benefits information that was the subject of the Contractors' misrepresentations was material, because reasonable employees and retirees, including Plaintiffs and the members of the Classes, viewed this information as important to their personal decision-making. As a result of the Contractors' misrepresentations, Plaintiffs and the members of the Classes were induced to act on their understanding that they would have a right to receive throughout retirement and for their lifetimes a level of healthcare benefits equal to what they had at the time they retired.  Plaintiffs and the members of the Classes were induced to seek employment at Y-12 with its high-risk work environment in large measure because they were repeatedly told that their healthcare needs after retirement would be covered.  As a further consequence of the misrepresentations, the Plaintiffs and the members of the Classes made important personal decisions relating to their retirement, their own and their spouses' post-retirement employment, their investments, their purchase of personal and real property, their purchase of life and health insurance, and to other decisions pertinent to household budgeting and finances. Plaintiffs and the members of the Classes suffered financial harm from these decisions made in reliance on representations made by the Contractors when significantly reduced the levels of benefits and increased costs for both pre-Medicare and Medicare-eligible retirees and dependents took effect on January 1, 2015.

35.     On January 1, 2015, CNS dramatically altered the retiree healthcare benefits by significantly increasing out-of-pocket costs in terms of premiums, deductible and copays and by reducing the level of benefits being received by the Plaintiffs and the members of the Classes.

36.     These reductions in retiree healthcare benefits levels and increases in out-of-pocket costs are unlawful as set forth below and they have caused Plaintiffs and the members of the Classes injury and damage in the form of *inter alia*: 1) payment of increased premiums for

medical and prescription drug benefits; 2) significant reductions in the level of coverage for medical services and prescription drug benefits; and 3) the inability to obtain or maintain alternative medical and/or prescription drug coverage at reasonable cost due to their now advanced ages and impaired health conditions.

37.     Plaintiffs and the members of the Classes also suffered other financial losses resulting from the Contractors' negligent and/or fraudulent misrepresentations, including the loss of salary, pension and other fringe benefits that they would have received as a result of continued employment had they not been induced by the Contractors to retire when they did, and the loss of income and earnings from post-retirement employment and business opportunities that they would have received had they not been misled by Contractors about the nature and security of their retiree healthcare benefits.

38.     For example, Plaintiff Betty Lou Hatmaker's husband, covered as the spouse of a Y-12 retiree, went from paying $178.00/month for his healthcare coverage to paying $230.00/month beginning January 1, 2015. This was an increase of 22.91%.

39.     Plaintiff Betty Lou Hatmaker suffered the following increased out-of-pocket costs for her retiree healthcare coverage as a result of the changes instituted by CNS on January 1, 2015:

|  | 2014 | 2015 |
|---|---|---|
| Annual Deductible | $0.00 | $750.00 |
| Prescription Deductible | $0.00 | $150.00 |
| Hospitalization Deductible | $0.00 | $3,250.00 (10% up to this amount) |
| PCP Copay | $10.00 | $25.00 |
| Specialist Copay | $10.00 | $50.00 |
| PT Copay | $10.00 | $50.00 |

40. Plaintiff Charlene Cromer Edwards suffered the following increased out-of-pocket costs for her retiree healthcare coverage as a result of the changes instituted by CNS on January 1, 2015:

|                          | 2014           | 2015                          |
|--------------------------|----------------|-------------------------------|
| Annual Deductible        | $0.00          | $750.00                       |
| Prescription Copay       | $5.00/$10.00   | $150.00                       |
| Hospitalization Deductible | $0.00        | $3,250.00 (10% up to this amount) |
| PCP Copay                | $10.00         | $25.00                        |
| Specialist Copay         | $10.00         | $50.00                        |
| PT Copay                 | $10.00         | $50.00                        |

41. As described above, the Contractors, their agents and representatives, acting in a fiduciary capacity to explain the retiree benefits provided by the Plans, consistently and repeatedly authorized, ratified or stated numerous misrepresentations to the Plaintiffs and the members of the Classes regarding their lifetime rights to their retiree healthcare benefits from the plans at issue in this Complaint. The Contractors, their agents and representatives, acting in a fiduciary capacity to explain the retiree benefits provided by the Plans, consistently and repeatedly omitted or failed to provide the Plaintiffs and the members of the Classes complete and accurate information regarding nature, scope, duration and immutability of their retiree healthcare benefits derived from the Plan at issue in this Complaint. This conduct occurred within the course and scope of the Contractors' agents' and representatives' employment and fiduciary agency with the Contractors.

42. As hereinafter alleged, if the retiree healthcare benefits were not in fact secure from reduction or termination during retirement, then the Contractors systematically misrepresented the nature, quality, security and duration of the retiree healthcare benefits to the Plaintiffs and the members of the Classes, by failing to clearly and conspicuously disclose material information about the healthcare benefits.

16

43. The Contractors' conduct also fraudulently misrepresented and/or concealed the fact that they retained the ability to reduce or terminate the retiree healthcare benefits at any time. Accordingly, the Plaintiffs and the members of the Classes, having relied on these misrepresentations and omissions, had no reason to believe either that the Contractors had misrepresented the benefits, that their rights had been violated, that they needed to seek legal counsel to determine their rights, or that legal action was necessary to protect their rights.

44. As a result of the misrepresentations and omissions perpetrated by the Contractors, such as those described in detail above, the Plaintiffs and the members of the Classes were negligently and/or fraudulently induced to act in justifiable reliance on their understanding that they would have a right to receive throughout retirement and for their lifetimes company-subsidized healthcare with the same out-of-pocket costs and same benefit levels that they had at the time the retired.

45. As a further result of and in reliance upon the Contractors' negligent and/or fraudulent misrepresentations and omissions, the Plaintiffs and the members of the Classes made important personal decisions relating to their retirement, their own and their spouses' post-retirement employment, their investments, their purchase of personal and real property, their purchase of life and other healthcare insurance, and made other decisions pertinent to household budgeting and finances. The Plaintiffs and the members of the Classes thereby suffered financial harm from these decisions when CNS implemented changes to these benefits on January 1, 2015.

46. Now, absent Court intervention, the reductions in benefit levels and the increases in healthcare out-of-pocket costs imposed by CNS on January 1, 2015 will continue to place an unlawful, unfair and improper burden on the Plaintiffs and the members of the Classes in direct contravention to representations made to them during their employment with the Contractors.

## FRADULENT INDUCEMENT

47.     Consistent with the written terms of the their employment agreements and the representations made to them by the Contractors, their agents and representatives, the Plaintiffs and the members of the Classes were told on many occasions during the term of their employment that upon retirement, that they would have the same healthcare benefits levels during their retirement.  In other words, when retirees retired they "got what they had" while they were employees, and there were to be neither significant increases in out-of-pocket costs nor any reduction in benefits levels from what they had at the time they retired.

48.     The Plaintiffs and the members of the Classes were defrauded by being led to believe that their employment agreements provided them with a specific level of benefits defined at the time retired.  The Plaintiffs and the members of the Classes were never told that any of the Contractors, or particularly CNS, retained the authority to substantially reduce their healthcare benefits or dramatically increase the out-of-pocket costs for these benefits.  In fact, as described above the Plaintiffs and the members of the Classes were told the exact opposite—these were "lifetime" benefits that would not change.

49.     Since January 1, 2015, the Plaintiffs and the members of the Classes have seen their healthcare benefit levels significantly reduced while at the same time the associated out-of-pocket costs for many of them has been dramatically increased, all contrary to what they had been told and led to believe by the Contractors during their active employment.

50.     These reductions in retiree benefit levels and increases in out-of-pocket costs are unlawful as set forth below and have caused the Plaintiffs and the members of the Classes injuries and damages such as *inter alia*: 1) payment of increased premiums for healthcare coverage and substantially increased out-of-pocket costs relating to medical services and

prescription drugs; 2) inability to obtain or maintain alternative medical and prescription drug coverage at reasonable cost due to their now advanced ages and impaired healthcare conditions; 3) worry and anxiety over their financial well-being; 4) and reduction in income available for necessities of life.

51.     The Plaintiffs and the members of the Classes also suffered other financial losses resulting from CNS' and the Contractors' negligent and/or fraudulent misrepresentations, including the loss of salary, pension and other fringe benefits that they would have received as a result of continued employment had they not been induced to retire early, as well as the loss of income and earnings from post-retirement employment and business opportunities that they would have received had they not been misled about the security of their retiree healthcare benefits.

52.     The *ultra vires* reduction and/or termination of the medical, prescription drug, and related benefits, and the commensurate increases in associated out-of-pocket costs (e.g., deductibles, copays, etc.) compared to what was previously provided to the Plaintiffs and the members of the Classes is actionable under 29 U.S.C. § 1132 (a)(1)(B), 29 U.S.C. § 1132 (a)(2), 29 U.S.C. § 1132 (a)(3) and 29 U.S.C. § 1104(a).

## CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this putative class action pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2) and (b)(3).

54.     Plaintiffs seek to represent Classes consisting of individuals, spouses, surviving spouses and/or eligible dependents of individuals, who worked at Y-12 pursuant to employment agreements between CNS or the Contractors as hourly or salaried employees and who retired from such employment between 1975 and 2015 and are Medicare-eligible, whose negotiated

healthcare and related benefits have been or may be improperly modified, amended or terminated by CNS as of January 1, 2015 ("Medicare-eligible Retirees").

57. 55. Plaintiffs also seek to represent Classes consisting of individuals, spouses, surviving spouses and/or eligible dependents of individuals, who worked at Y-12 pursuant to employment agreements between CNS or the Contractors as hourly or salaried employees and who retired from such employment between 1985 and 2015 and are below the age of Medicare eligibility, whose negotiated healthcare and related benefits have been or may be improperly modified, amended or terminated by CNS as of January 1, 2015 ("Pre-Medicare Retirees").

56. The exact number of Class members identified in the preceding paragraphs is not presently known but upon information and belief is several thousand and is so numerous that joinder of the individual members in this action is impracticable.

57. Plaintiffs Betty Hatmaker and Charlene Edwards are adequate and qualified representative members of the Classes.

58. There are common questions of law and fact in this action that relate to and affect Classes and that arise out of the Contractors' and CNS' conduct making this an appropriate case for resolution by means of a class action. The common issues include but are not limited to the following:

     a.    Whether the Contractors breached their fiduciary duties to Plaintiffs and the members of the Classes by making negligent and/or fraudulent misrepresentations or omissions about the duration of the retiree healthcare benefits;

     b.    Whether the Contractors breached their fiduciary duties to Plaintiffs and the members of the Classes by making negligent and/or fraudulent misrepresentations or omissions about the levels of the retiree healthcare benefits;

     c.    Whether the Contractors breached their fiduciary duties to Plaintiffs and the members of the Classes by making negligent and/or fraudulent

misrepresentations or omissions about the Contractors' ability to reduce the level of retiree healthcare benefits;

d.      Whether Plaintiffs and the members of the Classes are entitled to relief in the form of an order declaring the class member retirees and surviving spouses are vested in the welfare benefits plan benefits provided to them and their spouses at the time of their retirement (or earlier vesting in the plan) or as a result of their spouse's death;

e.      Whether the Contractors breached their fiduciary duties, responsibilities, and obligations imposed upon it by ERISA;

f.      Whether the Contractors negligently and/or fraudulently disclosed inaccurate and misleading information regarding Plaintiffs' and the members of the Classes' healthcare benefits to the class or the class' agents during the relevant time period and;

g.      Whether the Contractors were acting in a fiduciary capacity by negligently and/or fraudulently disclosing inaccurate information to the Plaintiffs and the members of the Classes regarding the welfare benefits;

h.      Whether the Contractors were acting in a fiduciary capacity by negligently and/or fraudulently failing to disclose accurate information to the Plaintiffs and the members of the Classes regarding the welfare benefits;

i.      Whether and the Contractors' inaccurate communications to the Plaintiffs and the members of the Classes during the relevant time period, constituted a fraudulent breach of their fiduciary duties;

j.      Whether the Contractors' incomplete communications to the Plaintiffs and the members of the Classes during the relevant time period, constituted a fraudulent breach of their fiduciary duties;

k.      Whether the Plaintiffs and the members of the Classes were harmed by the Contractors' breach of fiduciary duties;

l.      Whether the Plaintiffs and the members of the Classes were harmed by the CNS' changes to the retiree healthcare benefits implemented on January 1, 2015;

m.      Whether class members are entitled to compensatory damages, declaratory relief, injunctive relief, or restitution; and

n.      Whether the Plaintiffs and the members of the Classes are entitled to reasonable attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

59.     The Plaintiffs are able to and will fairly and adequately protect the interests of the class members.  The attorneys for the Plaintiffs are experienced and capable in the field of labor law, employee benefits law and retiree healthcare benefits law in particular, and have successfully prosecuted other class actions of a similar nature.

60.     This action is properly maintained as a class action under Fed. R. Civ. P. 23(b)(1) in that prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; and/or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

61.     This action is also properly maintained as a class action under Fed. R. Civ. P. 23(b)(2) in that CNS has acted on grounds generally applicable to the Classes by changing retiree healthcare benefits they are obligated to provide to the Classes thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.

62.     Alternatively, this action is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) as the common questions of law and fact described above predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

63.     Plaintiffs have exhausted administrative remedies to the extent any such remedies are available under the terms of the plan and/or such remedies are futile or otherwise not required by law.

64. Plaintiffs' claims are not barred by any applicable statute of limitations or repose as these claims are filed within six years from the date of their discovery of the Contractors' negligent and/or fraudulent misrepresentations.

**FIRST CAUSE OF ACTION**
**INJUNCTIVE OR MONETARY RELIEF FOR**
**BREACH OF FIDUCIARY DUTY**
**PURSUANT TO 29 U.S.C. § 1104(a)(1) and 29 U.S.C. § 1132(a)(3)**

65. Plaintiffs, reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint, and further allege as follows.

66. Under 29 U.S.C. § 1132(a)(3) a participant or beneficiary may bring suit to enjoin any act or practice that violates any provision of ERISA or the terms of a plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provision of ERISA.

67. Under 29 U.S.C. § 1002(21)(A), CNS qualifies as a fiduciary with respect to a the Plaintiffs' and the members of the Classes' retiree healthcare plan because it: 1) exercises discretionary authority or discretionary control respecting management of the plan, 2) exercises authority or control respecting management or disposition of the retiree healthcare plan's assets, and 3) has discretionary authority or discretionary responsibility in the administration of the retiree healthcare plan.

68. The duties charged to an ERISA fiduciary are the highest known to the law.

69. A fiduciary breaches its duties by materially misleading plan participants, regardless of whether the fiduciary's statements were made negligently or intentionally. Furthermore, a fiduciary's duty to disclose entails not only a negative duty not to misinform, but also an affirmative duty to inform when silence might be harmful.

70.     Under, 29 U.S.C. § 1104(a)(1), fiduciaries must discharge their duties with respect to the Plan: 1) solely in the interest of the participants and beneficiaries; 2) for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administration; 3) with the care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; and 4) in accordance with the documents and instruments governing the retiree healthcare Plan.

71.     If the Plaintiffs' and the members of the Classes' healthcare benefits were not in fact secure from reduction or termination during retirement, then the Contractors violated 29 U.S.C. § 1104(a), because they were aware of this material fact but negligently and/or fraudulently misrepresented it to the Plaintiffs and the members of the Classes by failing to clearly and conspicuously disclose this material information about the benefits, and/or by affirmatively misrepresenting or implying that the retiree healthcare benefits would be provided at the same level and cost for the lifetimes of the retirees as they had at the time they retired.

72.     The Contractors knew (or as reasonable fiduciaries should have known or foreseen) that their conduct in describing the benefits in this manner was false, fraudulent and misleading.  The Contractors also knew (or as reasonable fiduciaries should have known or foreseen) that this information would be important to the Plaintiffs and the members of the Classes, would be influencing important personal decisions to be made by the Plaintiff and the members of the Classes such as whether and when to retiree, and was confusing to the Plaintiffs and the members of the Classes about their understanding that their retiree healthcare benefits were secure, both before and after retirement.  The Contractors intended and expected that the Plaintiffs and the members of the Classes would act based upon the Plaintiffs and the members

of the Classes understandable reliance upon the Contractors' negligent and/or fraudulent misrepresentations and omissions.

73.     Notwithstanding the material nature of the healthcare benefits information that the Contractors misrepresented, they never acted to correct the misinformation given to the Plaintiffs and the members of the Classes, but instead acted to reinforce and conceal their misrepresentations about the nature, scope, security and immutability of the retiree healthcare benefits through a company-wide pattern and practice of continued, pervasive misstatements and omissions.

74.     If the Plaintiffs' and members of the Classes' retiree healthcare benefits were not in fact secure from reduction or termination during retirement, then the Contractors breached their fiduciary duties on a continuing basis by negligently and/or fraudulently misrepresenting the healthcare benefits through their failure to clearly and conspicuously disclose to the Plaintiffs and the members of the Classes: 1) complete, accurate and non-misleading material information regarding the possibility of future adverse changes to their retiree healthcare benefits; 2) the material information that these healthcare benefits were not secure; and 3) that changes were possible and/or were under serious consideration.

75.     Each of the Contractors, along with CNS, was a "co-fiduciary" and is jointly liable for all breaches committed by each other Contractor, including each of the Contractor's employees and agents, who misrepresented material information about the benefits, under 29 U.S.C. § 1105.   Each Contractor along with CNS is liable because each: 1) knowingly participated in, or knowingly undertook to conceal, acts or omissions of one or more other fiduciaries regarding the healthcare benefits misrepresentations, knowing such acts or omissions were a breach; 2) failed to train, supervise and monitor the other fiduciaries and their agents and

representatives, enabling one or more other fiduciaries to commit a fiduciary breach in misrepresenting material healthcare benefits information and thereby failing to comply with its own fiduciary duties in the administration of its specific responsibilities to accurately and clearly provide the benefits information; and/or 3) knew of a breach by one or more other fiduciaries in the misrepresentation of material healthcare benefits information but failed to make reasonable efforts under the circumstances to adequately correct and cure the misrepresentations and otherwise remedy the breach.

76. By negligently and/or fraudulently misrepresenting to the Plaintiffs and the members of the Classes that their retiree healthcare benefits would be provided for life, would be affordable and would have no reduction in benefit levels, the Contractors breached their fiduciary duties to Plaintiffs and the members of the Classes.

77. By failing to provide complete and accurate information to Plaintiffs and the members of the Classes regarding the possibility of future changes to their retiree healthcare benefits, the Contractors breached their fiduciary duties to Plaintiffs and the members of the Classes.

78. By failing to disclose that the changes to the retiree medical benefits were under serious consideration and/or by related acts and omissions, the Contractors breached their fiduciary duties to Plaintiffs and the members of the Classes.

79. The Contractors' negligent and/or fraudulent misrepresentations described above were material because there was a substantial likelihood that they would mislead Plaintiffs and the members of the Classes into making an inadequately informed decision in pursuing benefits to which they were entitled. By misleading Plaintiffs and the members of the Classes about the duration, cost and levels of their retiree healthcare benefits, the Contractors prevented the

Plaintiffs and the members of the Classes from making adequately informed decisions about their retirement.

80.     As a direct and proximate result of the Contractors' breach of fiduciary duties coupled with CNS' changes to the retiree healthcare benefits implemented on January 1, 2015, the Plaintiffs and the members of the Classes have suffered harm in the form of significantly increased out-of-pocket costs for their retiree healthcare plan, and significantly reduced benefit levels under their retiree healthcare Plan.

81.     Because the harm suffered by the Plaintiffs and the members of the Classes is ongoing, they are entitled to an order enjoining CNS from continuing to implement the cost increase and corresponding benefit level reductions initiated on January 1, 2015, and requiring CNS to return to and maintain the benefits levels previously provided to Plaintiffs and the Classes from the time of their retirement.

82.     Because the harm suffered by the Plaintiffs and the members of the Classes is ongoing, an actual controversy exists because Plaintiffs and the members of the Classes contend that are entitled to have their retiree healthcare benefits returned to the costs and levels that existed prior to January 1, 2015.   Upon information and belief, CNS contends that it rightfully reduced the coverage available under its retiree healthcare plan and that it rightfully required increased premium payments toward that coverage.

83.     Alternatively, Plaintiffs and the members of the Classes are entitled to monetary compensation in the form of the value of the benefits they have lost as a result of the Contractors' misinformation about its ability to reduce benefit levels in the future.

84.     Plaintiffs and the members of the Classes are further entitled to an award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and such other and further relief as the Court may deem equitable and just.

**SECOND CAUSE OF ACTION**
**RESTORATION OF BENEFITS PURSUANT TO**
**29 U.S.C. § 1132(a)(1)(B)**

85.     Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint, and further allege as follows.

86.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a participant or beneficiary to bring suit to restore and reinstate benefits due under the terms of a plan, to enforce his or her rights under a plan, or to clarify his or her rights to future benefits under the terms of a Plan.

87.     In contravention of these rights, Defendants have withheld and will withhold benefits from the Plaintiffs and the members of the Class such that they are entitled to relief in the form of: 1) an Order declaring that the retiree medical benefits provided to them at the times of their retirements are permanent, and that any Plan amendment purporting to reduce or terminate any of such benefits is null and void; 2) an Order reforming the Plans to remove all amendments that have purported to reduce or terminate any of such benefits; 3) an Order requiring CNS and the Plan to pay all past due and future retiree healthcare benefits improperly withheld from Plaintiffs and the members of the Class; an award of reasonable attorneys' fees, expenses and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g); and such other relief as the Court may deem equitable and just.

### THIRD CAUSE OF ACTION
### DECLARATORY RELIEF PURSUANT TO
### 28 U.S.C. § 2201 and 29 U.S.C. § 1132(a)(1)(B) and (3)

88.     Plaintiffs reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint, and further allege as follows.

89.     This Count is brought on behalf of Plaintiffs and the members of the Classes against CNS in its capacity as sponsor of the subject retiree healthcare Plan, and against CNS in its capacity as administrator of the subject retiree healthcare Plan.

90.     This claim is brought under 28 U.S.C. § 2201 and 29 U.S.C. § 1132(a)(1)(B) and (3).

91.     An actual controversy exists between the parties as follows: the Plaintiffs and the members of the Classes contend that their company-subsidized retiree healthcare benefits provided to them at the time of retirement not be materially reduced or terminated during their retirements. Upon information and belief, CNS contends that it lawfully reduced or terminated these benefits. Due to the recent actions by CNS in reducing benefit levels and simultaneously increasing associated out-of-pocket costs, this controversy warrants declaratory relief.

92.     The Plaintiffs and the members of the Classes are entitled to declaratory relief: 1) in the form of an Order determining that the Plaintiffs and the members of the Classes are entitled to reinstatement and restoration of the previous benefit levels and associated out-of-pocket costs of retiree healthcare benefits, 2) in the form and amounts in which they received them at the time of their retirement; 3) reasonable attorneys' fees, expenses and out-of-pocket costs pursuant to 29 U.S.C. § 1132(g); and 4) such other and further relief as the Court may deem equitable and just.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue an Order that will:

A.      Certify this action as a class action, appoint Betty Hatmaker and Charlene Edwards as Class representatives and appoint the undersigned attorneys as counsel for the Classes.

B.      Declare that the Plaintiffs and the members of the Classes are entitled to reinstatement and restoration of the previous benefit levels and associated out-of-pocket costs of retiree healthcare benefits, in the form and amounts in which they received them at the time of their retirements.

C.      Preliminarily and permanently enjoin CNS from requiring the retiree healthcare premium increases initiated on January 1, 2015.

D.      Preliminarily and permanently require CNS to return to and maintain the retiree healthcare benefit levels previously provided to Plaintiffs and the members of the Classes from the time of their retirement.

E.      Order a surcharge on CNS, and grant restitution and other monetary relief, to make the Plaintiffs and the members of the Classes whole for all losses caused by the unlawful actions of CNS, including payment of all medical benefits, prescription drug benefits and subsidies, and life insurance benefits, that have been improperly withheld from the Plaintiffs and the members of the Classes as of the time of judgment;

F.      In the alternative, grant the Plaintiffs and the members of the Classes monetary damages as necessary to restore them to the position in which they would and should have been in but for CNS' and the Contractors' breach of fiduciary duties.

G. Award Plaintiffs and the members of the Classes reasonable attorneys' fees and costs incurred in this action pursuant to 29 U.S.C. § 626(b) and 29 U.S.C. § 216(b).

H. Award Plaintiffs and the members of the Classes prejudgment interest.

I. Grant such further relief as may be deemed necessary and proper.

J. Plaintiffs and the members of the Classes request a jury trial of all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ Gregory F. Coleman

By: _____

Gregory F. Coleman
Mark E. Silvey
Adam E. Edwards
Lisa A. White
GREG COLEMAN LAW PC
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: 865-247-0080
Facsimile: 865-522-0049
greg@gregcolemanlaw.com
mark@gregcolemanlaw.com
adam@gregcolemanlaw.com
lisa@gregcolemanlaw.com

*Attorneys for Plaintiffs*

31